THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CHELSEY SUITTER,<br><br>Plaintiff,<br><br>v.<br><br>BIOLIFE PLASMA, LLC,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 4:18-cv-00005-DN-PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

This case involves claims arising from Defendant BioLife Plasma LLC's ("BioLife") termination of Plaintiff Chelsey Suitter's ("Suitter") employment.[1] Suitter alleges that BioLife violated her rights under the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA").[2] BioLife seeks summary judgment on Suitter's claims arguing that she cannot establish discrimination or retaliation under the ADA, and cannot establish discrimination, retaliation, or interference under the FMLA.[3]

Because Suitter fails to present sufficient facts and evidence to establish a genuine issue for trial as to pretextual nature of BioLife's stated reason for her termination , Suitter's ADA and FMLA discrimination and retaliation claims fail as a matter of law. And because the undisputed material facts demonstrate that BioLife would have dismissed Suitter regardless of her FMLA

---

[1] Complaint at 1, docket no. 2, filed Mar. 13, 2018.

[2] *Id*. ¶¶ 29-60 at 5-9.

[3] Defendant's Motion for Summary Judgment, Or Alternatively, Partial Summary Judgment ("Motion for Summary Judgment"), docket no. 36, filed Mar. 8, 2019.

request, Suitter's FMLA interference claim fails as a matter of law. Therefore, BioLife's Motion

for Summary Judgment[4] is GRANTED.

**Contents**

UNDISPUTED MATERIAL FACTS ............................................................................................ 2
STANDARD OF REVIEW ...................................................................................................... 15
DISCUSSION ........................................................................................................................ 16
    Suitter fails to establish a genuine issue for trial on her ADA discrimination claim........ 16
        BioLife has established a legitimate, non-discriminatory reason for terminating
            Suitter's employment .................................................................................. 18
        Suitter fails to create a genuine issue for trial regarding pretext .......................... 20
    Suitter fails to establish a genuine issue for trial on her ADA retaliation claim and her
        FMLA discrimination and retaliation claims ........................................................ 26
    Suitter fails to establish a genuine issue for trial on her FMLA interference claim ........ 27
ORDER ................................................................................................................................. 29

**UNDISPUTED MATERIAL FACTS[5]**

1.      Between approximately March 30, 2015, and April 21, 2017, Suitter was

employed by BioLife as an Advanced Plasma Center Technician ("APCT").[6]

---

[4] Docket no. 36, filed Mar. 8, 2019.

[5] The following Undisputed Facts are taken from the parties briefing on BioLife's Motion for Summary Judgment. Motion for Summary Judgment ¶¶ 1-43 at 11-17; Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Response") ¶¶ 1-88 at 24-38, docket no. 43, filed Apr. 17, 2019. These Undisputed Facts contain facts that are not necessarily material, but nevertheless provide a more complete background of the events and circumstances to give context to the parties' arguments. Those facts, or portions thereof, identified in the parties' briefing that do not appear in these Undisputed Facts are either disputed; not supported by the cited evidence; not material; or are not facts, but rather, are characterization of facts or legal argument. Additionally, Suitter attempts to dispute many of BioLife's asserted undisputed facts based on semantics and inter-related hearsay, authentication, and foundation objections. Response at 10-24. Suitter's attempts fail. Her semantics arguments are sufficient to dispute a characterization within BioLife's asserted facts. But her arguments do not create a genuine dispute of the asserted facts. Suitter's objections are also overruled. The purported hearsay statements are not offered for their truth, but rather, for their effect on the individual or individuals that heard or reviewed the statements. And there is sufficient foundation and authenticity provided for those effects to be admissible.

[6] Motion for Summary Judgment ¶ 1 at 11 (citing Videotaped Deposition of Chelsey Suitter ("Suitter Depo.") at 21:9-12, 126:17-127:3; docket no. 36-6, filed Mar. 8, 2019; Deposition of Maxwell Miller ("Miller Depo.") at 23:9-21; docket no. 36-7, filed Mar. 8, 2019; Declaration of Sheila Stachura in Support of Defendant's Motion for Summary Judgment, or Alternatively, Partial Summary Judgment ("Stachura Decl.") ¶ 12, docket no. 36-3, filed Mar. 8, 2019).

2.      On March 29, 2017, Suitter submitted a Request for Reasonable Accommodation Form and supporting medical documentation to BioLife. In her request, Suitter stated: "Due to the severity of lumbar fusion & inflammatory disease, I am only allowed to work 6 1/2 hour shifts."[7]

3.      Suitter's request for reasonable accommodation was accompanied by a note from her treating physician, Dr. Max Root, confirming that she may not work shifts longer than 6.5 hours. Suitter's request was also accompanied by a medical record from Dr. Root, dated March 16, 2017, which refers to her lower back pain and documents post-operative and degenerative changes shown in an MRI. Dr. Root's diagnoses included low back pain, post-laminectomy syndrome, and disc degeneration.[8]

4.      Suitter testified that she talked about her back pain with BioLife's St. George Center Manager, Maxwell Miller, but does not remember the details of those discussions. She further testified that she talked with Miller about her back pain at the time she submitted her request for reasonable accommodation.[9]

5.      Miller confirmed that he and Cayla Wessley (an employee in BioLife's Human Resources Department) considered employee requests for reasonable accommodation, and that they were the individuals who decided whether to grant or deny a request.[10]

6.      By email, dated March 29, 2017, Wessley sent Suitter's request for reasonable accommodation and supporting medical documentation to Miller.[11]

---

[7] *Id*. ¶ 9 at 12 (citing Suitter Depo. at 51:6-14, 54:6-8, 56: 3-14, Depo. Ex. 3); Response ¶ 9 at 26 (citing Suitter's Accommodation Request, docket no. 43-10, filed Apr. 17, 2019).

[8] Response ¶ 10 at 26 (citing Suitter's Accommodation Request).

[9] *Id*. ¶ 16 at 27 (citing Suitter Depo. at 43:11-44:12).

[10] *Id*. ¶ 8 at 26 (citing Miller Depo. at 45:2-18, 46:3-6).

[11] *Id*. ¶ 11 at 26 (citing Suitter's Accommodation Request).

7.      Miller testified that he would have seen a Human Resources manager's grant or denial of a request for reasonable accommodation. He also testified that he was aware if any employee was working under an ADA accommodation.[12]

8.      On March 30, 2017, BioLife approved Suitter's request to work no more than 6.5 hours in a shift. Miller printed off the approval of Suitter's request for reasonable accommodation and provided it to her the next day.[13]

9.      Miller testified that at the time he notified Suitter of the approval, he would have "at a minimum" been aware that she was requesting the accommodation due to the severity of her "lumbar fusion inflammatory disease."[14]

10.     Suitter testified that after her request was approved, BioLife accommodated her with shifts that were 6.5 hours or less.[15]

11.     Suitter made a request for FMLA leave on April 12, 2017, wherein she requested periodic time off, as needed, for her medical conditions.[16]

12.     BioLife policy requires employees who request FMLA leave due to a disabling medical condition to file a separate short-term disability claim.[17]

---

[12] *Id*. ¶ 7 at 25 (citing Miller Depo. at 43:6-21).

[13] *Id*. ¶ 12 at 26 (citing Miller Depo. at 107:6-8, 108:20-25); Motion for Summary Judgment ¶ 10 at 12 (citing Suitter Depo. at 53:18-20, 54:19-23, Depo. Ex. 4).

[14] Response ¶ 13 at 26 (citing Miller Depo. at 109:5-12).

[15] Motion for Summary Judgment ¶ 11 at 11(citing Suitter Depo. 56:15-18).

[16] *Id*. ¶ 39 at 17 (citing Suitter Depo. at 39:18-24, 56:19-57:12, Depo. Ex. 2); Response ¶ 34 at 30 (citing Defendant BioLife Plasma Answer to Complaint ¶ 25 at 9, docket no. 6, filed Apr. 4, 2018; Letter from Liberty Mutual, docket no. 43-19, filed Apr. 17, 2019).

[17] Response ¶ 30 at 29 (citing Excerpts from BioLife's Employee Handbook at D000026-27, docket no. 43-7, filed Apr. 17, 2019; Miller Depo. at 50:13-19).

13.     By letter, dated April 12, 2017, Liberty Mutual notified Suitter that it received her request for FMLA leave. In this letter, Liberty Mutual asked Suitter to "have her Health Care Provider" complete a "Certification" form.[18]

14.     Following her FMLA leave request, Suitter communicated with Liberty Mutual regarding her request.[19]

15.     Suitter testified that she never told Miller about her FMLA leave request or provided him any related documentation.[20]

16.     On April 13, 2017, Miller was notified by an Assistant Manager that APCT Wendy Armstrong found a full blood sample in a HemataSTAT that was believed to have not been tested.[21]

17.     BioLife has Standard Operating Procedures ("SOPs") that require administration of hematocrit and protein level tests to determine whether a donor is eligible to donate plasma.[22]

18.     According to BioLife's SOPs, after cleaning a donor's finger, the technician performs a "fingerstick" to draw blood, which is placed in a capillary tube. After the blood is collected, BioLife evaluates the sample for hematocrit and protein levels. If the hematocrit and

---

[18] *Id*. ¶ 35 at 30 (citing Letter from Liberty Mutual). The scope of Liberty Mutual's role regarding FMLA leave requests of BioLife employees is disputed.

[19] Motion for Summary Judgment ¶ 40 at 17 (citing Suitter Depo. at 39:18-24, 56:19-57:12, 66:14-18, Depo. Ex. 2). Whether Suitter communicated *only* with Liberty Mutual about her FMLA leave request after making the request is disputed.

[20] *Id*. ¶ 41 at 17 (citing Suitter Depo. at 59:19-60:7, 64:4-16).

[21] *Id*. ¶ 16 at 13 (citing Suitter Depo. at 170:10-171:4; Miller Depo. at 143:3-146:4); Response ¶ 59 at 34 (citing BioLife's Response to Charge at 5, docket no. 43-22, filed Apr. 17, 2019; Miller Depo. at 143:3-7), ¶ 60 at 34 (citing Suitter Depo. at 106:23-107:23).

[22] Motion for Summary Judgment ¶ 13 at 13 (citing Suitter Depo. at 90:24-91:8; Miller Depo. at 30:5-25, 31:23-32:10, Depo. Ex. 13).

protein levels satisfy FDA standards, the donor is eligible to donate provided that the donor meets all other eligibility criteria.[23]

19.     To be eligible to donate blood plasma, the donor must have a total protein value of between 6.0 to 9.0. For a male donor, the donor must have a blood/plasma ratio of 39:54. For a female donor, the donor must have a ratio of 38:54.[24]

20.     To test a blood sample's hematocrit, the technician places the sample in the HemataSTAT, a machine which separates plasma from whole blood in approximately 3-5 seconds, and then provides the ratio of blood to plasma.[25]

21.     The technician is required to process the blood sample through the HemataSTAT before running the sample through the refractometer. After the sample is processed through the HemataSTAT, the technician records the ratio in the donor information system using an adjacent computer terminal.[26]

22.     The technician next places the blood sample in the refractometer to test the blood's protein level. After a "few seconds," the refractometer provides the protein level using an optical lens, and the technician records the level in the donor information system.[27]

23.     The HemataSTAT and refractometer are in proximity to each other as part of a "station" for the donation process. There were eight or nine HemataSTATs and refractometers at BioLife's St. George Donation Center in 2017.[28]

---

[23] Response ¶ 1 at 24 (citing BioLife's Standard Operating Procedures, docket no. 43-9, filed Apr. 17, 2019; Miller Depo. at 20:16-25, 21:1-16, 122:2-11, 123:1-10).

[24] *Id*. ¶ 6 at 25 (citing Miller Depo. at 118:24-119:20).

[25] *Id*. ¶ 2 at 25 (citing Miller Depo. at 112:24-25, 113:4-15, 114:2-25).

[26] *Id*. ¶ 3 at 25 (citing Miller Depo. at 115:1-17).

[27] *Id*. ¶ 4 at 25 (citing Miller Depo. at 116:10-13, 117:2-15).

[28] *Id*. ¶ 5 at 25 (citing Miller Depo. at 114:10-13, 117:21-25, 118:4-11).

24.     BioLife's SOPs require that an APCT concurrently document a donor's hematocrit and protein levels in the donor information system as soon as the values are determined.[29]

25.     Suitter was aware of BioLife's SOPs.[30]

26.     After Armstrong found the blood sample in a HemataSTAT on April 13, 2017, BioLife started an investigation to determine who left the sample in the HemataSTAT.[31]

27.     Miller was not at BioLife's St. George Donation Center on the week of April 10-17, 2017.[32]

28.     Miller was advised that Assistant Manager Adam Green and Shaun Cox (a member of BioLife's Quality Department), reached the conclusion that the blood sample left in the HemataSTAT belonged to the first donor of the day on April 13, 2017 (donor A30917601, Scott de Geus), whom Suitter had purportedly screened that morning.[33]

29.     The recorded protein reading for de Geus on the morning of April 13, 2017, was 6.7, which was consistent with his previous protein readings.[34]

30.     The recorded hematocrit reading for de Geus on the morning of April 13, 2017, was 48, which was also consistent with his previous readings.[35]

---

[29] Motion for Summary Judgment ¶ 14 at 13 (citing Suitter Depo. at 90:24-91:8; Miller Depo. at 30:3-25, 115:5-12, 117:13-18, Depo. Ex. 13).

[30] *Id*. ¶ 15 at 13 (citing Suitter Depo. at 85:8-14, 87:10-12, 91:9-21; Miller Depo. at 33:13-34:2).

[31] Response ¶ 61 at 34 (citing Miller Depo. at 148:13-17).

[32] *Id*. ¶ 62 at 34 (citing Miller Depo. at 144:14-145:6).

[33] *Id*. ¶ 59 at 34 (citing BioLife's Response to Charge at 5; Miller Depo. at 143:3-7), ¶ 60 at 34 (citing Suitter Depo. at 106:23-107:23); Motion for Summary Judgment ¶ 17 at 13 (citing Miller Depo. at 147:22-148:8, 134:11-24, Depo. Ex. 33).

[34] Response ¶ 51 at 33 (citing Declaration of Scott de Geus ("de Geus Decl.") ¶ 13 at 3-4, docket no. 43-21, filed Apr. 17, 2019; Defendant's Response to Interrogatories, Set Two at 2-3, docket no. 43-20, filed Apr. 17, 2019).

[35] *Id*. ¶ 52 at 33 (citing de Geus Decl. ¶ 13 at 3-4; Defendant's Response to Interrogatories, Set Two at 2-3).

31.     BioLife asserts that Suitter "falsified" de Geus's April 13, 2017 readings. According to BioLife, de Geus's total protein reading of 6.7 was a falsification of records.[36]

32.     BioLife also called into question de Geus's hematocrit reading, but BioLife does not assert that Suitter falsified that reading.[37]

33.     BioLife's Employee Handbook lists a policy for Corrective Action Guidelines. This policy states that corrective action includes: (1) an informal warning; (2) a first notice; (3) a final notice; and (4) termination. BioLife was not required to follow these steps sequentially and depending on the nature and severity of the conduct at issue, BioLife could take action that did not follow this sequence.[38]

34.     In additional to the four-step progressive discipline outlined in BioLife's Corrective Action Guidelines, BioLife could also suspend an employee before termination. In determining whether suspension or termination was warranted, the decision did not depend on any specific criteria. It was decided at the manager's discretion, usually in conjunction with human resources.[39]

35.     However, BioLife's Corrective Action Guidelines inform employees that falsification of company records may result in corrective action, including termination, and state that "employees are required to adhere to all applicable SOPs, company policies, and center policies."[40]

---

[36] Response ¶ 36 at 30 (citing Defendant's Responses to Interrogatories, Set One at 6, docket no. 43-5, filed Apr. 17, 2019; Defendant's Response to Interrogatories, Set Two at 2-3, docket no. 43-20, filed Apr. 17, 2019; Miller Depo. at 138:3-14).

[37] Id. ¶ 37 at 31 (citing Miller Depo. at 138:21-25, 139:1-2).

[38] Id. ¶ 73 at 36 (citing Excerpts from BioLife's Employee Handbook at D000034; Miller Depo. at 52:14-53:10).

[39] Id. ¶ 74 at 36 (citing Miller Depo. 59:1-11).

[40] Motion for Summary Judgment ¶ 2 at 11 (citing Stachura Decl. ¶ 7, Decl. Ex. D).

36.     It is BioLife's policy that employees who engage in falsification of records—which is defined as "the intentional entry of inaccurate data or of unobserved results"—are subject to immediate disciplinary action, up to and including termination.[41]

37.     It is BioLife's policy that Unit Over Nomogram ("UON") is not treated as conduct of comparable seriousness to falsification.[42]

38.     It is BioLife's policy that not all SOP violations relating to safety are conduct of comparable seriousness to falsification.[43]

39.     It is BioLife's policy that actions that may fall within the scope of fraudulent time entry practices are not conduct of comparable seriousness to falsification.[44]

40.     Suitter underwent training on these policies on various occasions during her employment at BioLife.[45]

41.     As part of BioLife's investigation of the April 13, 2017 incident, Miller reviewed a witness statement purportedly from Armstrong regarding the incident. The witness statement indicated that Armstrong found a sample that appeared as if it had not been read because no plasma had been taken out of the tube. The witness statement noted Armstrong's confusion regarding how Suitter was processing a donation from a donor whose tests and readings had not been completed.[46]

---

[41] *Id*. ¶ 3 at 11-12 (citing Miller Depo. at 23:23-24:9, Depo. Ex. 12; Stachura Decl. ¶ 8, Decl. Ex. E).

[42] *Id*. ¶ 35 at 16 (citing Suitter Depo. at 223:19-24; Declaration of Maxwell Miller in Support of Defendant's Motion for Summary Judgment, or Alternatively, Partial Summary Judgment ("Miller Decl.") ¶ 22, docket no. 36-2, filed Mar. 8, 2019).

[43] *Id*. ¶ 36 at 16 (citing Miller Decl. ¶ 22).

[44] *Id*. ¶ 37 at 17 (citing Miller Decl. ¶ 24, Decl. Ex. E).

[45] *Id*. ¶ 4 at 12 (citing Suitter Depo. at 116:18-118:10, 119:3-19, Depo. Ex. 24; Stachura Decl. ¶¶ 9, 11, Decl. Ex. F).

[46] *Id*. ¶ 18 at 14 (citing Miller Depo. at 166:9-167:3, Depo Ex. 37 at D000132; Miller Decl. ¶ 7, Ex. A). Armstrong's witness statement was incorrectly dated April 12, 2017. Miller Depo. at Depo Ex. 37 at D000132.

42.     Miller testified that he did not know "why or how [Armstrong] knew the hematocrit level [(as opposed to the protein level)] was not read." Armstrong did not speak directly to Miller about what she found.[47]

43.     Suitter testified that she believed there was no reason that Armstrong would say any negative things about her or try to cause trouble for her at work, and that Armstrong did not have a reputation for lying.[48]

44.     According to BioLife, the sample Armstrong found was tested and then destroyed by Green or Klint Marler (BioLife's Center Manager) on April 13, 2017. Miller did not know the results of the test from the sample, and Miller did not personally inspect the tube before it was destroyed.[49]

45.     BioLife waited until April 20, 2017, to approach Suitter and ask her about the April 13, 2017 incident. While the investigation was ongoing, BioLife did not fear that Suitter was putting its donors' safety in jeopardy.[50]

46.     Suitter confirmed that she did not speak to anyone about the sample Armstrong found until April 20, 2017. Suitter continued working and reported to her shifts on April 14, 17, 18, 20, and 21, 2017.[51]

47.     As part of BioLife's investigation, Miller reviewed a witness statement drafted by BioLife employee Jasmine Garcia, which was in the form of notes taken during a conversation between Marler and Suitter regarding the April 13, 2017 incident. The statement indicated that

---

[47] Response ¶ 63 at 35 (citing Miller Depo. at 143:12-15, 144:1-7, 152:5-8).

[48] Motion for Summary Judgment ¶ 19 at 14 (citing Suitter Depo. at 170:10-171:1).

[49] Response ¶ 64 at 35 (citing Miller Depo. at 146:8-21, 150:1-3).

[50] Id. ¶ 65 at 35 (citing Miller Depo. at 156:3-157:2).

[51] Id. ¶ 66 at 35 (citing Suitter Depo. at 111:18-23; Ex 26).

the only explanation Suitter could think of for entering a total protein value in the donor information system was that the sample in the refractometer must have been from the morning's calibration readings. The statement also indicated that Suitter saw a protein sample in the refractometer and that she "just read it, [she] spaced it."[52]

48.     Suitter testified that during her discussion with Marler on April 20, 2017, Marler phrased his questions as hypotheticals.[53]

49.     Suitter testified that she could not think of a reason why Miller would question the witness statement, and that she does not contend Miller falsified the statement.[54]

50.     A Senior Sample Processing Technician, Lori Davidson, informed Miller that on April 13, 2017, she observed Suitter screening a donor and, at some point during the process, Suitter seemed confused and stared at her computer screen for a long time. Miller viewed this as abnormal. Davidson explained to Miller that the donor whom Suitter had been working with proceeded to the donation floor and Suitter followed him shortly after, and approximately 45 minutes later, she observed that Armstrong went to the booth where Suitter had been last and found the sample in the HemataSTAT.[55]

51.     Suitter testified that Miller would have no reason to question Davidson's statement.[56]

52.     Another Senior Plasma Center Technician, Joel Nakila, informed Miller that he recalled the April 13, 2017 incident involving Suitter which he described as "sound[ing] pretty

---

[52] Motion for Summary Judgment ¶ 20 at 14 (citing Miller Depo. at 165:14-18; Suitter Depo. at 139:22-141:13, Depo. Ex. 28).

[53] Response ¶ 67 at 35 (citing Suitter Depo. at 141:19-142:16, 149:11-12).

[54] Motion for Summary Judgment ¶ 21 at 14 (citing Suitter Depo. at 155:21-156:5).

[55] Id. ¶ 22 at 14 (citing Miller Depo. at 130:6-7, 150:23-152:4, 167:4-168:9, Depo. Ex. 37 at D000133-134).

[56] Id. ¶ 23 at 15 (citing Suitter Depo. at 166:5-13).

serious." Nakila indicated to Miller that he believed the discrepancy may have been that the iron (hematocrit) and protein readings had not yet been taken.[57]

53.     As part of BioLife's investigation, Miller reviewed the information entered in the donor information system for April 13, 2017. Miller observed that Suitter's credentials were associated with the entry of the donor's hematocrit and total protein levels into the system, and he concluded that she entered those values into the system.[58]

54.     Miller also reviewed BioLife's internal equipment management system and data verification reports. Miller observed that the refractometer passed the mandatory verification checks (which are part of the calibration testing process) less than an hour before Suitter processed the first donor on April 13, 2017.[59]

55.     BioLife's general procedure is that after the verification checks are completed, the refractometer is thoroughly cleaned with water and alcohol wipes, and then dried to ensure that no residue is left on the surface.[60]

56.     There was no indication in BioLife's system that the refractometer calibration had been completed incorrectly on the morning of April 13, 2017.[61]

57.     Miller observed that none of the results of the refractometer calibration testing matched what was entered for the first donor of the day on April 13, 2017.[62]

---

[57] Id. ¶ 24 at 15 (citing Miller Depo. at 169:18-171:3, Depo. Ex. 37 at D000135-136).

[58] Id. ¶ 25 at 15 (citing Miller Depo. at 23:23-24:13, 153:7-21, Depo. Ex. 12.; Miller Decl. ¶ 13, Decl. Ex. C).

[59] Id. ¶ 26 at 15 (citing Miller Depo. at 23:23-24:13, 154:24-155:13, Depo. Ex. 12, Depo. Ex. 31; Miller Decl. ¶ 10).

[60] Id. ¶ 27 at 15 (citing Miller Decl. ¶ 10).

[61] Id. ¶ 28 at 15 (citing Miller Decl. ¶ 10; Miller Depo. at 130:23-131:3, Depo. Ex. 31).

[62] Id. ¶ 29 at 15 (citing Miller Depo. at 131:21-133:24, Depo. Ex. 32, Depo. Ex. 33; Miller Decl. ¶ 11).

58.     Miller determined that it was improbable that Suitter could have read a calibration result to obtain the entered protein value for the first donor of the day on April 13, 2017.[63]

59.     Miller reviewed the readings for the last donor from April 12, 2017, the day before the incident. Miller noted that the readings from this donor did not match the information entered by Suitter on the morning of April 13, 2017.[64]

60.     Miller determined that it was improbable that Suitter could have read a sample that was left behind the previous day.[65]

61.     Based on the totality of the investigation, Miller determined that Suitter could not have mistakenly read a prior sample. He determined Suitter entered a number in the donor information system that was not the result of any test. Miller concluded that Suitter falsified records in the donor information system. He also concluded that, under the circumstances, it was possible the donor's hematocrit reading was also falsified.[66]

62.     Miller conferred with his supervisor, Jeff Reading (BioLife's Operations Manager for the West Region), and Sheila Stachura (BioLife's Human Resources Business Lead) regarding his investigation and findings.[67]

63.     Miller, Reading, and Stachura agreed that Suitter's actions on April 13, 2017, constituted falsification of donor records.[68]

---

[63] *Id*. ¶ 30 at 15 (citing Miller Decl. ¶ 11).

[64] *Id*. ¶ 31 at 16 (citing Miller Depo. at 198:14-199:1; Miller Decl. ¶ 12).

[65] *Id*. ¶ 32 at 16 (citing Miller Decl. ¶ 12).

[66] *Id*. ¶ 33 at 16 (citing Miller Depo. at 143:2-9; Miller Decl. ¶ 14).

[67] *Id*. ¶ 34 at 16 (citing Miller Depo. at 23:23-24:13, 175:21-179:19; Miller Decl. ¶ 16; Stachura Decl. ¶¶ 14-15; Declaration of Jeff Reading in Support of Defendant's Motion for Summary Judgment, or Alternatively, Partial Summary Judgment ("Reading Decl.") ¶¶ 4-5, docket no. 36-4, filed Mar. 8, 2019).

[68] *Id*. ¶ 5 at 12 (citing Miller Depo. at 175:21-179:19, 23:23-24:13, Depo. Ex. 12; Miller Decl. ¶ 17; Stachura Decl. ¶¶ 15-17; Reading Decl. ¶ 7.

64.     Miller, Reading, and Stachura made the collective decision to terminate Suitter's employment.[69]

65.     On April 21, 2017, at approximately 10:30 a.m., after Suitter had worked several hours into her shift, BioLife presented her with an Employee Conference Memorandum ("ECM") documenting the termination of her employment. At that time, Suitter met with Green and Miller. Suitter testified that Miller told her that the termination was due to "donor safety."[70]

66.     Suitter testified that she told Miller that she believed her termination was not based on a proper investigation.[71]

67.     Suitter testified that there is no direct evidence that her termination was based on discriminatory intent on the part of BioLife.[72]

68.     There is no direct evidence that Miller, Reading, or Stachura decided to terminate Suitter because of her disabilities.[73]

69.     On August 22, 2016, approximately seven months before Suitter's request for accommodation, Miller sent an instant message to Brian Hammond (BioLife's HR Partner), wherein Miller stated: "Chelsey Suitter is currently on FMLA. i *[sic]* have two employees that she had approached prior to going and asked them how she (Chelsey) could work or play the system because she hated working here."[74]

---

[69] *Id*. ¶ 6 at 12 (citing Miller Depo. at 23:23-24:13, Depo. Ex. 12 ; Miller Decl. ¶ 18; Stachura Decl. ¶ 17; Reading Decl. ¶ 7.)

[70] Response ¶ 70 at 35-36 (citing Suitter Depo. at 213:14-25, 214:13-21).

[71] *Id*. ¶ 71 at 36 (citing Suitter Depo. at 215:17-22).

[72] Motion for Summary Judgment ¶ 7 at 12 (citing Suitter Depo. at 38:5-39:17).

[73] *Id*. ¶ 8 at 12 (citing Miller Decl. ¶¶ 25-26; Stachura Decl. ¶¶ 19-20; Reading Decl. ¶¶ 9-10).

[74] Response ¶ 31 at 29-30 (citing Miller Instant Message, docket no. 43-17, filed Apr. 17, 2019; Miller Depo. at 99:18-24, 100:10-20).

70.     Suitter testified that BioLife did not subject her to any unfair treatment or adverse action resulting from her prior requests for accommodations in 2012 and 2016.[75]

71.     Another employee under Miller's supervision was terminated for falsifying records prior to Suitter's termination.[76]

72.     Reading and Stachura had no knowledge of Suitter's pending FMLA leave request at the time the decision was made to terminate Suitter's employment.[77]

73.     Suitter's FMLA leave request was denied after BioLife terminated her employment.[78]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[79] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[80] or "if a reasonable jury could return a verdict for the nonmoving party."[81] A fact is material if "it is essential to the proper disposition of [a] claim."[82] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorably to the nonmoving party.[83]

---

[75] Motion for Summary Judgment ¶ 12 at 13 (citing Suitter Depo. at 68:15-18, 77:22-25, 83:15-17).

[76] *Id*. ¶ 38 at 17 (citing Miller Decl. ¶ 20, Decl. Ex. D).

[77] *Id*. ¶ 42 at 17 (citing Miller Decl. ¶ 19; Stachura Decl. ¶ 18; Reading Decl. ¶ 8; Deposition of Brian Seiler ("Seiler Depo.") at 13:2-11, docket no. 43-3, filed Apr. 17, 2019). Whether Miller had knowledge of Suitter's pending FMLA leave request at the time the decision was made to terminate Suitter's employment is disputed.

[78] *Id*. ¶ 43 at 17 (citing Suitter Depo. at 66:25-67:11, Depo. Ex. 7).

[79] FED. R. CIV. P. 56(a).

[80] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[81] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

[82] *Adler*, 144 F.3d at 670.

[83] *Id.*

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[84] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[85] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[86]

## DISCUSSION

Suitter's Complaint asserts three causes of action against BioLife: (1) discrimination in violation of the ADA; (2) retaliation violation of the ADA; and (3) retaliation, discrimination, and interference in violation of the FMLA.[87] BioLife argues that it is entitled to summary judgment on these claims because Suitter was terminated for a legitimate, non-discriminatory reason after its investigation concluded that she falsified donor records.[88]

**Suitter fails to establish a genuine issue for trial on her ADA discrimination claim**

The ADA prohibits covered employers from discriminating against disabled individuals.[89] In *McDonnell Douglas Corp. v. Green*,[90] the Supreme Court created a burden-shifting analysis for ADA discrimination claims where an employee, such as Suitter,[91] relies on circumstantial evidence. "Under this analysis, if the employee establishes a prima facie

---

[84] *Id*. at 670-71.

[85] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations and citations omitted; emphasis in original).

[86] *Id.* (internal quotations omitted).

[87] Complaint ¶¶ 29-60 at 5-9.

[88] Motion for Summary Judgment.

[89] 42 U.S.C. § 12112(a).

[90] 411 U.S. 792 (1973).

[91] *Supra*, Undisputed Facts ¶ 67 at 14.

case of discrimination, then a presumption of discrimination arises, resulting in the burden shifting to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."[92] "If the employer carries its burden of production, the presumption of discrimination drops out of the case, and the burden then shifts back to the employee, who must prove by a preponderance of the evidence that the employer's reasons are a pretext for unlawful discrimination.[93]

BioLife argues that Suitter cannot meet her initial burden of establishing a prima facie case of ADA discrimination,[94] and that Suitter cannot establish that BioLife's reason for terminating her employment was pretextual.[95] Suitter argues that she has presented sufficient facts and evidence to establish a prima facie case of discrimination and pretext.[96] Because BioLife has established a legitimate, non-discriminatory reason for terminating Suitter's employment,[97] and because Suitter fails to present sufficient facts and evidence to create a genuine issue for trial regarding whether BioLife's stated reason for terminating her employment was pretextual,[98] it is unnecessary to address whether Suitter has established a prima facie case of discrimination. Therefore, it is assumed, without deciding, that Suitter has established a prima facie case of discrimination.

---

[92] *Thomas v. Avis Rent a Car*, 408 Fed. App'x 145, 152 (10th Cir. 2011) (internal quotations omitted).

[93] *Id*. (internal quotations and punctuation omitted).

[94] Motion for Summary Judgment at 19-20.

[95] *Id*. at 21-26.

[96] Response at 48-60.

[97] *Infra*, Discussion at 18-19.

[98] *Id*. at 20-26.

**BioLife has established a legitimate, non-discriminatory reason for terminating Suitter's employment**

"[T]o rebut the presumption that arises upon the establishment of a prima facie case of discrimination, the second step of the *McDonnell Douglas* burden shifting analysis requires the employer to produce enough competent evidence . . . to enable a rational factfinder to conclude that there exists a nondiscriminatory reason for the challenged employment action."[99] The undisputed material facts demonstrate that BioLife has met this burden.

Using semantics and technicality, Suitter argues that BioLife has given inconsistent reasons for her termination.[100] Suitter asserts that when she was fired on April 21, 2017, Miller told her that the termination was based on "donor safety."[101] And Suitter points out that it is undisputed that while BioLife's investigation was ongoing, BioLife did not fear that she was putting its donors' safety in jeopardy.[102] Suitter also refers to BioLife's response to an interrogatory which states that she was terminated for falsifying work records and failing to adhere to BioLife's SOPs.[103] And she points out that the box for a failure to follow a BioLife "SOP" was not checked in the ECM she was provided upon her termination.[104] This is not sufficient to create an issue of fact regarding BioLife's stated basis for terminating Suitter's employment.

Miller may have believed and told Suitter that falsification of donor records is a donor safety issue. And falsification of donor records may or may not include a failure to adhere to

---

[99] *Holly v. Kindred Healthcare Operating, Inc.*, 51 F. Supp. 3d 1113, 1121 (D. Utah 2014).

[100] Response at 57.

[101] *Supra*, Undisputed Facts ¶ 65 at 14.

[102] *Id*. ¶¶ 45-46 at 10.

[103] Defendant's Response to Interrogatories, Set One at 3, docket no. 43-5, filed Apr. 17, 2019.

[104] Employee Conference Memorandum, docket no. 43-26, filed Apr. 17, 2019.

BioLife's SOPs. But it is undisputed that after completing the investigation, Miller, Reading, and Stachura conferred and agreed that Suitter's actions on April 13, 2017, constituted falsification of donor records.[105] The "falsification" of records box in the ECM provided to Suitter upon her termination is clearly checked.[106] And the ECM expressly references the following as the basis for Suitter's termination:

> The Bio[L]ife employee handbook on page 45 paragraph 3 states the following: All employees must legibly, accurately, and completely record information in compliance with Baxalta, BioLife, and Good Documentation Practices (GDP) requirements. The intentional entry of inaccurate data or unobserved results is considered falsification of records. Intentional acts of record falsification will not be tolerated and will result in immediate disciplinary action up to and including termination. Examples of this type of behavior include, but are not limited to:
>
> - Falsifying any company, work-related, or regulatory record or document.
> - Non-concurrent documentation in violation of Standard Operating Procedures (SOP's)[.][107]

There is no genuine confusion or inconsistency in BioLife's stated reason for terminating Suitter's employment. The undisputed material facts demonstrate that BioLife terminated Suitter's employment after investigating the April 13, 2017 incident and concluding that Suitter falsified donor records.[108] This is a sufficiently legitimate, non-discriminatory reason for the termination to carry BioLife's burden in the second step of the *McDonnell Douglas* burden shifting analysis. Therefore, the burden shifts back to Suitter to establish a genuine dispute regarding whether BioLife's actions were pretextual.[109] She fails to meet this burden.

---

[105] *Supra*, Undisputed Facts ¶¶ 61-64 at 13-14.

[106] Employee Conference Memorandum.

[107] *Id*.

[108] *Supra*, Undisputed Facts ¶¶ 61-64 at 13-14.

[109] *Thomas*, 408 Fed. App'x at 152; *Holly*, 51 F. Supp. 3d at 1122.

**Suitter fails to create a genuine issue for trial regarding pretext**

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[110] "Mere conjecture that the employer's explanation is a pretest for intentional discrimination is an insufficient basis for denial of summary judgment."[111]

"When assessing a contention of pretext, [courts] examine the facts as they appear to the person making the decision to terminate the plaintiff."[112] "[T]he relevant inquiry is not whether [the employer's] proffered reasons were wise, fair[,] or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs."[113] "The reason for this rule is plain: [a court's] role is to prevent intentional discriminatory . . . practices, not to act as a super personnel department, second guessing employers' honestly held (even if erroneous) business judgments."[114]

To support her pretext argument, Suitter points to the temporal proximity of her request for accommodation and her termination—a 23-day period.[115] This provides some support for her claim, but "th[is] evidence indicates at most that she has established a prima facie case."[116] "Although temporal proximity is one relevant factor to be considered . . . in determining whether

---

[110] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).

[111] *Id*. (internal quotations and punctuation omitted).

[112] *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001) (internal quotations and punctuation omitted).

[113] *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (internal quotations omitted).

[114] *Cooper v. Wal-Mart Stores, Inc.*, 296 Fed. App'x 686, 689 (10th Cir. 2008) (internal quotations omitted).

[115] *Supra*, Undisputed Facts ¶ 2 at 2-3, ¶ 65 at 14.

[116] *Selenke*, 248 F.3d at 1260.

an employer's explanation is a pretext for [discrimination] . . . even very close temporal proximity [cannot] operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext."[117] "To raise a fact issue of pretext, [the plaintiff] must . . . present evidence of temporal proximity *plus* circumstantial evidence of [discriminatory] motive."[118] As discussed below,[119] Suitter fails to present such evidence.

Additionally, the temporal proximity of Suitter's request for accommodation and her termination is mitigated because it is undisputed that BioLife approved Suitter's request and subsequently accommodated her as requested.[120] It is also undisputed that BioLife approved Suitter's prior requests for accommodations in 2012 and 2016.[121] And while Miller expressed concern that Suitter may try to "work or play the system" following her 2016 request,[122] it is undisputed that Suitter did not receive any unfair treatment or adverse action from BioLife as a result of her prior requests.[123] Indeed, Suitter has not argued, or presented evidence suggesting, that her prior requests played a role in BioLife's decision to terminate her employment. Therefore, the temporal proximity of Suitter's request for accommodation and her termination is not sufficient to establish pretext.

Suitter next argues that pretext is shown because BioLife's investigation was flawed and reached a false conclusion.[124] To support this argument, Suitter presents facts and evidence

---

[117] *Metzier v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006) (internal quotations and punctuation omitted).

[118] *Id*. (emphasis in original).

[119] *Infra*, Discussion at 21-26.

[120] *Supra*, Undisputed Facts ¶¶ 8, 10 at 4.

[121] *Id*. ¶ 70 at 15.

[122] *Id*. ¶ 69 at 14.

[123] *Id*. ¶ 70 at 15.

[124] Response at 52-56, 58-60.

regarding Scott de Geus, the donor whose blood sample Suitter took on April 13, 2017; Suitter's conduct on the day of the incident; and BioLife's investigation.[125] But to adequately demonstrate a flawed investigation, Suitter must present "evidence of not just any procedural shortfall, but of a disturbing procedural irregularity, that is often exemplified by an employer's falsifying or manipulating of relevant criteria."[126] The "plaintiff must identify an applicable written or unwritten policy or procedure that the employer failed to follow."[127] Suitter's additional facts and evidence are insufficient.

Suitter's additional facts and evidence do not relate to a written or unwritten policy or procedure that BioLife ignored or manipulated during its investigation. Suitter points to no policy or procedure that required BioLife to interview or obtain information about de Geus as part of its investigation. And it is not reasonable to infer that BioLife should have expected de Geus to have any expertise in or knowledge of blood donations generally, or BioLife's specific policies and procedures for taking blood donations. Indeed, Suitter testified that "[s]ome donors will just head to the floor without waiting to see what their iron and protein readings are."[128]

Suitter also points to no BioLife policy or procedure that required Miller to personally conduct interviews of BioLife employees, or which prohibited BioLife's decision makers (Miller, Reading, and Stachura) from relying on the witness statements taken during the investigation. Suitter testified that Miller had no reason to question the content of the witness

---

[125] *Id*. ¶¶ 38-50 at 31-32, 53-58 at 33-34.

[126] *Cooper*, 296 Fed. App'x at 696 (internal quotations and citations omitted).

[127] *Id*. at 695.

[128] Suitter Depo. at 102:11-13.

statements, and that she had no reason to believe that Miller would lie or falsify any statements that were made in the course of the investigation.[129]

That Suitter may, after the fact, be able to establish that BioLife's investigation reached an inaccurate conclusion is not the appropriate standard. Whether Suitter actually falsified donor records or not, the "employer's *perception of the facts* at the time of the decision to terminate controls."[130] What matters is the facts as they appeared to BioLife's decision makers at the time they made the termination decision, and whether they honestly believed those reasons and acted in good faith upon those beliefs.[131]

BioLife's decision makers reached a conclusion that Suitter intentionally entered a false value into the donor information system.[132] It is undisputed that BioLife's investigation of the April 13, 2017 incident included interviewing and taking witness statements from Suitter and other BioLife employees.[133] The investigation also included review of data entered in BioLife's donor information system; the internal equipment management system; data verification reports; the calibration system; and comparing the readings from the calibration testing and the last donor on the day before the incident to those entered by Suitter.[134]

The conclusion that Suitter falsified donor information reasonably and naturally flows from the information BioLife undisputedly obtained in its investigation. Suitter's additional facts and evidence do not sufficiently challenge the genuineness of BioLife's investigation or the decision makers' conclusion that she intentionally falsified donor records. The additional facts

---

[129] *Supra* at Undisputed Material Facts ¶ 43 at 10, ¶¶ 49, 51 at 11.

[130] *Holly*, 51 F. Supp. 3d at 1122.

[131] *Stover*, 382 F.3d at 1076.

[132] *Supra* Undisputed Material Facts ¶¶ 61-64 at 13-14.

[133] *Id*. ¶¶ 41-52 at 9-12.

[134] *Id*. ¶¶ 53-60 at 12-13.

and evidence do not suggest the type of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions to allow reasonable inference that BioLife did not act in good faith for its stated non-discriminatory reason. Therefore, Suitter fails to create a genuine issue for trial regarding whether BioLife's investigation was flawed or ingenuine, or that BioLife's decision makers lacked a good faith belief that Suitter falsified donor records.

To support her pretext argument, Suitter again asserts that BioLife has given inconsistent reasons for her termination.[135] As discussed,[136] there is no genuine confusion or inconsistency in BioLife's stated basis for terminating Suitter's employment. The undisputed material facts demonstrate that BioLife terminated Suitter's employment after investigating the April 13, 2017 incident and concluding that Suitter falsified donor records.[137] Therefore, Suitter's assertions that BioLife has given inconsistent reasons for her termination do not create a genuine issue for trial regarding pretext.

Finally, Suitter argues that pretext is shown through her past job performance and awards, and that BioLife did not take a progressive discipline approach.[138] However, it is undisputed that BioLife's policies did not require it to follow a progressive discipline approach, and that falsifying donor records is a terminable violation.[139] It is also undisputed that Suitter was trained on these policies.[140] And Suitter fails to present sufficient facts and evidence to suggest that these policies were not consistently applied. Indeed, it is undisputed that

---

[135] Response at 57.

[136] *Supra*, Discussion at 18-19.

[137] *Supra*, Undisputed Facts ¶¶ 61-64 at 13-14.

[138] Response ¶¶ 75-82 at 36-38, ¶¶ 87-88 at 38, 57-60.

[139] *Supra*, Undisputed Facts ¶¶ 33-36 at 8-9.

[140] *Id*. ¶ 40 at 9.

approximately one month before the incident involving Suitter, BioLife terminated another

employee that Miller supervised who had falsified records.[141]

    In her attempt to show disparate treatment, Suitter's points to BioLife's treatment of other

employees who had falsified time records and reports, and who violated BioLife SOPs for

sealing and screening plasma, needle use, and exposing donors to other donor's blood.[142] But

"[s]imilarly situated employees are those who deal with the same supervisor and are subject to

the same standards governing performance evaluation and discipline."[143] And "even employees

who are similarly situated must have been disciplined for conduct of 'comparable seriousness' in

order for their disparate treatment to be relevant."[144]

    It is undisputed that BioLife's policies do not treat all SOP violations as conduct of

comparable seriousness.[145] It is undisputed that under BioLife's policies, the SOP violations that

Suitter relies on to show disparate treatment are not treated as comparable in seriousness to

falsifying donor records.[146] Suitter's reliance on BioLife's treatment of other employees that

violated these SOPs is insufficient to demonstrate disparate treatment. Therefore, Suitter fails to

present sufficient facts and evidence to create a genuine issue for trial regarding pretext based on

her past performance and awards and BioLife's failure to take a progressive discipline approach.

    Ultimately, Suitter fails to present sufficient facts and evidence sufficient to reasonably

suggest that BioLife's investigation was procedurally or substantively faulty, or that it was not

performed in good faith. Suitter fails to present sufficient facts and evidence sufficient to

---

[141] *Id*. ¶ 71 at 15.

[142] Response ¶¶ 87-88 at 38, 57-60.

[143] *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006).

[144] *Id*.

[145] *Supra*, Undisputed Facts ¶¶ 33-39 at 8-9.

[146] *Id*. ¶¶ 36-39 at 9.

reasonably suggest that BioLife's decision makers lacked a good faith belief that she falsified donor information. And Suitter fails to present sufficient facts and evidence sufficient to reasonably suggest that BioLife's termination decision was counter to its policies and procedures, or that BioLife exhibited disparate treatment of other similarly situated employees that committed comparable acts of seriousness. The temporal proximity between Suitter's request for accommodation and her termination,[147] and a single instant message that Miller sent approximately seven months before the request in which her expressed concern that Suitter may try to "work or play the system,"[148] are not sufficient to create a genuine issue for trial regarding discriminatory motive and pretext.

Considering the circumstances and undisputed material facts in their totality, Suitter fails to create a genuine issue for trial regarding whether BioLife's stated reason for her termination was pretextual. And because Suitter cannot establish pretext, her ADA discrimination claim fails as a matter of law. Therefore, BioLife is entitled to summary judgment on Suitter's ADA discrimination claim.

### Suitter fails to establish a genuine issue for trial on her ADA retaliation claim and her FMLA discrimination and retaliation claims

Suitter's ADA retaliation claim and her FMLA discrimination and retaliation claims are subject to the same *McDonnell Douglas* burden-shifting analysis as her ADA discrimination claim.[149] Therefore, Suitter has the same burden of establishing pretext on these claims as she did in her ADA discrimination claim.[150] In attempting to meet this burden, Suitter relies on the

---

[147] *Id*. ¶ 2 at 2-3, ¶ 65 at 14.

[148] *Id*. ¶ 70 at 15.

[149] *Metzler*, 464 F.3d at 1170; *Morgan*, 108 F.3d at 1323.

[150] *Thomas*, 408 Fed. App'x at 152; *Holly*, 51 F. Supp. 3d at 1122.

same facts, evidence, and arguments she relied on for her ADA discrimination claim.[151] As discussed,[152] Suitter fails to create a genuine issue for trial regarding whether BioLife's stated reason for her termination was pretextual. Because Suitter cannot establish pretext, her ADA retaliation claim and FLMA discrimination and retaliation claims fail as a matter of law. And BioLife is entitled to summary judgment on these claims.

### Suitter fails to establish a genuine issue for trial on her FMLA interference claim

The "*McDonnell Douglas* burden-shifting analysis does *not* apply to [FLMA] interference claims[.]"[153] Rather, "[t]o prevail on an interference [] theory, the plaintiff must demonstrate: (1) that he or she was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his or her right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his [or her] FMLA rights."[154] And "[u]nder this theory, a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent[.]"[155]

"If the employee can demonstrate that the first two elements of interference are satisfied, the employer then bears the burden of demonstrating that the adverse decision was not related to the exercise or attempted exercise of the employee's FMLA rights."[156] "In meeting this burden, the employer is not required to show that the adverse employment decision and the employee's FMLA request are completely and entirely unrelated."[157] "While 'related' may be defined in a

---

[151] Response at 51-60.

[152] *Supra*, Discussion at 20-26.

[153] *Metzler*, 464 F.3d, at 1180 (emphasis in original).

[154] *Id*. (internal quotations and punctuation omitted).

[155] *Id.*

[156] *Dalpiaz v. Carbon Cty., Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014) (internal quotations and punctuation omitted).

[157] *Id*.

broad sense as simply 'connected' or 'associated' in some way . . . an indirect causal link between dismissal and an FMLA leave is an inadequate basis for recovery."[158] And the employer will meet its burden by "demonstrat[ing] that an employee . . . would have been dismissed regardless of the employee's request for, or taking of, FMLA leave[.]"[159]

BioLife does not argue that Suitter cannot establish the first two elements of her FMLA interference claim. Rather, BioLife argues that the third element cannot be met because Suitter's employment would have been terminated regardless of her FMLA request.[160] Therefore, it is unnecessary to address whether Suitter can establish the first two elements of her FMLA interference claim.

In attempting to create a triable issue regarding whether her termination was related to her FMLA leave request Suitter points to facts and evidence that BioLife was aware of her disabilities and medical conditions; the temporal proximity of her leave request and her termination (9 days); and the same facts and evidence she relied on in attempting to demonstrate pretext.[161] This is not sufficient to create an issue for trial regarding whether BioLife would have terminated Suitter's employment regardless of her FLMA leave request.

As discussed in the context of Suitter's other claims, BioLife has established and the undisputed material facts demonstrate that BioLife terminated Suitter's employment after investigating the April 13, 2017 incident and concluding that Suitter falsified donor records.[162] The conclusion that Suitter falsified donor information reasonably and naturally flows from the

---

[158] *Id*. (internal citations omitted).

[159] *Metzler*, 464 F.3d at 1180.

[160] Motion for Summary Judgment at 29-30.

[161] Response at 47-48.

[162] *Supra*, Discussion at 18-19.

information BioLife undisputedly obtained in its investigation.[163] And the termination decision comported with BioLife's policies regarding falsifying donor records.[164] The undisputed material facts demonstrate the BioLife would have terminated (and did terminate) Suitter's employment regardless of her FMLA request, and no reasonable factfinder could conclude otherwise.

Because the undisputed material facts demonstrate that BioLife would have terminated Suitter's employment regardless of her FMLA request, Suitter's FLMA interference claim fails as a matter of law. Therefore, BioLife is entitled to summary judgment on the claim.

## ORDER

IT IS HEREBY ORDERED that BioLife's Motion for Summary Judgment[165] is GRANTED. Suitter's Complaint[166] is DISMISSED with prejudice.

The clerk is directed to close the case.

Signed March 28, 2022.

BY THE COURT

David Nuffer
United States District Judge

---

[163] *Id*. at 22-24.

[164] *Id*. at 22-25.

[165] Docket no. 36, filed Mar. 8, 2019.

[166] Docket no. 2, filed Mar. 13, 2018.